May it please the court, my name is Michael Milland. I am attorney for Ek Vathana, who is here today, along with several hundred investors in EverBank World Currency CDs. These CDs promise to pay investors in the aggregate, this is a certified class action, several hundred million Icelandic krona, which amounts to about four or five million dollars, give or take, damages haven't been calculated, in U.S. dollars. So this is a substantial case. The lower problem I have with the case is understanding whether in fact, as you just said, the contracts were for krona, or whether in fact they were for dollars, unless the investor specifically requested krona. There seems to be kind of a phantom arrangement here. The accounts were never converted to krona, but there were forward contracts as a hedge against any risk. Help me sort all of that out. Sure. Your Honor, one of the tricky things of this case is separating EverBank's back office operations, where they engage in sophisticated forward contracts and other things, versus the typical main street depositor in a bank, who all he or she knows is, I give my money, I have no claim on any particular fund of money in the bank, all I know is, I get, I'm a general creditor of the bank. So from the perspective of a customer, they, they, typically the way it works, and the way the record indicates it worked for Mr. Bethon, is he sends in U.S. dollars into just a plain old U.S. dollar account there. He then requests, would you please convert my dollars into a krona credit? That was done in this case? Yes. All right. Now remember, though, there are no actual krona. These are just chits in a computer about what you're owed or not owed. There's no real krona floating around. So what happens is, in terms of the bank actually holding it, it doesn't work like that in a bank. In other words, the bank takes the money and the bank erases the U.S. dollar credit that Mr. Bethon had, and in its place, the bank puts a credit for, well, using the ER-188, $3.5 million of Icelandic krona. So ER-188 shows that the bank has made a promise. This is the teaser notice, which hopefully I'll have time to get to in a moment, that was sent out 30 days before the krona CD became due. That teaser notice is very clear. It says the currency is Icelandic krona, and the principal value is 3.5 million Icelandic krona. Nowhere in this document of ER-188 does it ever state that there is a U.S. dollar equivalent or that U.S. dollars are even in play. It is certainly possible for a bank to make a promise, we will pay you Icelandic krona. Whether the bank chooses to hedge or not hedge, whether the bank chooses to go bare, whether the bank chooses to buy a lot of krona and stuff it in their bank vault to pay out these CDs, that is totally the bank's discretion. But we are not involved or worried about Everbank's troubles. The question here, Your Honor, is this. 2.7.10 of the terms and conditions says that when your CD comes due, either we're going to liquidate or there's a couple other options. Nobody cares about those. Well, your position is at that point your client has a right to reinvest in krona. Yes, Your Honor. And the bank's position is no, we have the right to close it out, which seems plausible. I mean, it seems that saying I have a right to stay in kronas indefinitely to the end of time seems a little much. Let me divide what Your Honor can say. Banks go out of business. They change lines. There has to be an end to things. And your reading seems to give your client a right to keep reinvesting in krona CDs in perpetuity. Your Honor, there are many businesses that make promises for lifetimes, a lifetime warranty on your television. But this is not lifetime. This is perpetuity. This is forever. Yes, for a particular client. But let me. No, no, I'm sorry. No, that's not right. If your client dies, the interest goes to his heirs and the heirs' heirs and the heirs' heirs. And if you read the clause as you have, as you construe it, his great-grandchildren in the 23rd century could still be saying, I want to, there may not be kronas. It may be that at that point Iceland is using the euro or whatever. And he says, no, I have a right to invest in krona. So I don't see why at the end of the CD. I understand in the middle he could say, well, but the CD is over. Why the bank can't say enough? We will not renew the, we will give you back your investment in krona or the dollar equivalent of krona. And if you want to make another krona investment, go somewhere else. Your Honor, let me do this. That is such, that is a very small point of our case. I will answer it, but I would like to get to the bigger points that you bring up, which is let's assume for the moment charitably that every bank has a right under TISA to, and under their terms, to issue some sort of a change in the CDs. Let's just go with that for a moment. You said you were going to answer it, and then you proceed with not answering it. Okay. I just remember you didn't answer it. I have not answered it yet, I agree with you. But let me bring up the bigger point that your question entails. If it's true that every bank has a right to end these CDs, that raises the question in our first summary judgment motion, which is, okay, the bank had a right to close this. How does it transmit the value of that CD to Mr. Vifano? How does that value get transmitted? Well, the UCC, UCC 3107, tells you how you transmit the value of an instrument that's denominated in a foreign currency. It says the following. If there's no agreement between the parties, we'll get to that in a second, the way you transmit the value is you pay it in the foreign currency, or you can give enough dollars so that the customer can run over to a window at the same bank, give those dollars, and get the foreign currency back. Either way, the customer winds up with a foreign currency. Every bank agrees it wasn't taken dollars and given foreign currency. But doesn't that UCC provision say only that the instrument may be paid in foreign currency? If the agreement doesn't pay otherwise, there's only – it says it may be paid A or B. That's the only way to pay it. That's this gap-filler provision, assuming the parties have not otherwise agreed. If an instrument – if I promise to pay you, Judge, 500 euros, this little instrument that I give to you, when it comes due, you can take the UCC provision and say, Mr. Millen, give me those 500 euros or give me enough dollars so I can go and get that many euros. Well, didn't your client get enough – he got dollars. Nothing prevented him the same day from going to Iceland and saying, I want to buy – or going someplace and buying Corona. That's the problem, Your Honor, is that the UCC says it has to be an available rate in the same place as the payment was made. It's the very same bank at the very same place. It's geographic. My client doesn't have to fly around the world. He goes to the same bank where he gets the money. Now, the bigger point, though, is every bank will come and tell you, well, Your Honors, that's very interesting about 3107, but it doesn't apply because 3107 only applies if the agreement is silent. And this agreement says something, and I'd like to briefly speak about that. This agreement says absolutely nothing about what will happen when the CD is ended and the value is returned. You'll notice that 2.7.10 talks about a liquidation of a CD. Fair enough. But what does that mean? Well, the one thing it doesn't say is the liquidation will be in United States dollars. It doesn't say that. It doesn't say anything about what form of money you will get back. That's why the UCC was specifically written and Florida legislature adopted it, so that in an instrument payable in a foreign currency, we know how it should be paid. Now, I would like to point out that when every bank wants to be clear that you're going to get a check for U.S. dollars, every bank can be very, very clear. In 2.7.8, this is the provision that talks about early withdrawal. We're all familiar with it. You want your money back now. You say, I want to break the CD. Fair enough. Every bank says if that's what happened, 2.7.8, you may come to us, and we will go ahead and we will agree, if it's extenuating, that we may allow an early withdrawal. Quote, a U.S. dollar check must be sent on an early withdrawal. Now, let me ask you, why is it when you do an early withdrawal, every bank clearly comes out and says U.S. dollar checks are sent on early withdrawals, but when it comes time to liquidation, they say nothing? The point, Your Honor, is simply that the parties never agreed on how liquidated CDs would be paid. So because there's no agreement, we use our law school 101, law school first-year concept, gap filler UCC provisions, and that's 3701, excuse me, 3.07. Counsel, opposing counsel is probably going to tell us that somewhere in this set of terms, this issue is covered, which would support their decision to distribute the way they did. What is your response? Your Honor. You've read their brief. Yes. Nowhere do they claim that there is a provision which says we will pay you in U.S. dollars. Now, we do have a little dispute about a secondary issue, which is if you get paid in U.S. dollars, will there be a conversion rate, and I will not take you down because of my very limited time, on this concept of the linguistic parsing. I think the briefs hit it probably ad nauseum that basically, and I'll briefly use my simple example. They take the third sentence of 2.7.1, which says your conversion rate will be 1% of the market, and they say that applies to everything. And my response is no, it's limited because the sentence before it says, if you request funds in this account to be denominated in a currency other than the currency sent to us, we will convert your funds using a then-current conversion rate set by us. Third sentence, your currency conversion rate will be dot, dot, dot. But didn't you tell us earlier that, in fact, the request was to invest in Krona? Oh, absolutely. Not only did Eck Pathana have his TISA notice which said, and this is, again, ER-188, that it will be reinvested in Krona, but he sent an e-mail which said, please make sure you either give me Krona or reinvest in Krona. So it was very clear what Mr. Pathana. What about Lake Side 2 provisions, 1.17 and 1.32? Sure. That is a completely separate argument. We don't have to win that in order to get a reversal, because if we prove the first point I just made, which is the money needs to be paid in Icelandic Krona, it doesn't matter whether it was okay. I'm sorry. Other than the UCC provision, can you point to any other provision in the agreement that says that you get paid in foreign currency? No. It's weird. It's silent. Okay. And so even though you point to the UCC provision and you put a lot of emphasis in the UCC provision that says you may be paid in dollars if the instrument does not prohibit it, I mean, I'm sorry. The comment section to 673-1071, which you're relying on, specifically says in the comment section that an instrument payable in foreign money may be paid in dollars if the instrument does not prohibit it. If it's silent, then it doesn't prohibit it? In terms of other words, you have to comply with the statute. Yes, you can pay in dollars, but it tells you the dollars you need to pay. It's dollars that are sufficient for you to go to the same bank at the same place and get your foreign currency. It specifically tells you how many dollars and how that procedure works. My other question that I have for you is what's your support for your contention that Everbank acted in bad faith when it did what it did? Your Honor, Everbank says that we had a right to close these accounts. This is the second argument that I'm unfortunately about out of time for. The second argument is Everbank had no right to close these accounts. Everbank says, listen, all we had to do is give reasonable notice. If we wanted to close them and if it's an emergency, we can close them without notice if it's going to cause a loss to you or to us. Well, the bad faith is Everbank purposefully, in order to protect themselves from the potential of loss, locked in a real loss for the customers at the bank. And so the point is when you have discretion to say I'm going to close this account if one of us is going to suffer loss, one of the reasonable expectations is you won't throw me under the bus in order to protect yourself because it's supposed to protect both of us. And it's not a good faith decision to do that. The last point I wanted to make as I'm running out of time here is about TISA. This point says the following. Everbank had a right, presumably under the contract, to close an account. If it had a right to close the account, that would be a change in the renewability. TISA says any change in renewability must be met with 30 days notice simply because a landlord has a right, to give an example in a real property context, a landlord has a right to change the terms and conditions of tenancy on a 30-day notice. The landlord may have that right, but if he shows up and says you're out tomorrow, that doesn't mean it's effective. It means that the notice period may start. The problem here, Your Honors, is that they gave, they said 30 days before the CD was due a TISA notice which said we will renew. Then a few days before they said something which said, you know, we're actually just going to sell you out. And that does not comply with TISA.  means it doesn't have to comply with TISA because, after all, it's not really changing its big block of terms and conditions. It's just modifying something. But surely if you went to a bank that said we will give you 3% on an interest on a CD and then the next day the bank said we're only going to give you 1%, the bank could not escape TISA by saying we didn't have to send a 30-day notice because we always have had discretion to change interest rates. So that's the problem with the lower court's analysis of TISA. And with that, I will end. Thank you. Thank you. I'm here for the last time. Good morning, Your Honors. Deborah Birnbach on behalf of defendants, appellees, upper bank, the upper bank entities. Let me start just so there's no confusion over the conversion rate issue. Very briefly, the 51 pages of account terms. This is a breach of contract case, Your Honor. The account terms are contained in the 51 pages of the terms and conditions. Section 2 of the terms and conditions, and in particular starting at excerpt of Record 94, is the section that deals with the world currency CDs. So the very first paragraph of section 2.7, which is on page 94 of the excerpts of Record, sets out in 2.7. Could you have made it smaller? I apologize, Your Honor. We didn't modify the font for the exhibits of Record. But doesn't that conversion rate, and hopefully I'm tracking you here, supplied in that paragraph 2.71 of the agreement, provide the currency conversion rate only for when upper bank initially converts U.S. dollars into foreign currency? Where does it say that that's the conversion rate for when later on when you take it out? Well, it's the conversion rate at all times for the duration of the CD, Your Honor. And, in fact, the title of the paragraph, Conversion Information, is in no way limited to the opening. And the definition of conversion rate says, Your currency conversion rate will be within 1% of the spot price. Further throughout that section, conversion rate is used several times, including when you get to paragraph 2.7.7, which is the lock-in alternative, the very beginning of which says, You may lock in your exit currency conversion rate prior to maturity by choosing this alternative. In other words, this conversion information, which is in every section of subsection 2 that deals with a foreign currency product, even not CDs, regular deposit accounts, deals with and defines in that third sentence your currency conversion rate. That definition is then carried through and used throughout this section four times. But why is this applicable? They're saying we're entitled to Kroner. We don't want to convert. We're not asking to convert. But why is the bank entitled to convert? I mean, yes, if you're entitled to convert, then you use this right. But where does this come into play? Two reasons, Your Honor. Paragraph 1.32 expressly provides that the bank is ---- Where is 1.32? 1.32 is on Excerpt of Record 85. Oh, this is Force Majeure? Yes. And that paragraph expressly says this is one place where it expressly provides for U.S. dollars. But you're not relying on Force Majeure.  We ---- it's not only an act of God. But under Florida law, as we cite in our brief, Force Majeure clauses can be far broader than acts of God or impossibility. And, in fact, in this clause, government restrictions or other events beyond Everbank's reasonable control in the latter part of that paragraph 1.32 ---- I'm sorry. What was the ---- what restriction? The government prevented Everbank from paying over Kroner? Yes. The government prevented ---- it disrupted the trading market in Kroner. No, no. I ask you a question. Did they ---- is there any prohibition against Everbank paying over Kroner when they closed the CD? The government restrictions prevented Everbank from obtaining Kroner to pay. Did they prevent them from paying him over? I mean, where it got to Kroner is Everbank's problem. You know, this is a risk it took. It chose not to buy Kroner ahead of time. It chose to buy these forward contracts. There's no prohibition against them paying over Kroner. I'm sure that they've gone and tried very hard. They could have gotten enough Kroner in the United States to pay over, right? There was no prohibition against that, right? The prohibition was on the ---- I'm asking you a question. I think the answer is ---- I'm asking you a question. Did you hear my question? Was there a prohibition against paying over Kroner? Okay, you can tell me something else after you're done answering my question. No. Was there a prohibition against paying over Kroner? No. So where does 132 come in? 132 comes in because Everbank has the sole discretion under Florida law because of those government restrictions which disrupted and, as Plaintiff's Own Expert admits, evaporated the spot trading market for Kroner as well as the forward market. So I think you've answered the Chief's question. What was the government restriction that you are relying upon here? The government restriction that we're relying upon here is October 10, 2008, the government put in place emergency currency restrictions which expressly prohibited the banks from engaging in trades in Kroner for foreign currency purposes. It limited the ---- This is the U.S. government? This is the Icelandic government. Okay. So what? So it just ---- So there were no Kroners you could have bought in France or from another bank? Is there no Kroner you could have gotten? I mean, if you'd had Kroner in your safe, you would have been prohibited from paying it over? No. So this is just a problem you have in meeting your contractual obligations. It's not a government prohibition. There's nothing about your obligation to the contract that the government prohibited. They made it more difficult. They made it more expensive. It's a risk you took by going with forward contracts rather than actually buying Kroner and keeping them in your safe. You know, it's a risk you took, and it's a reasonable business risk. But why is that a first measure? What does that have to do with government prohibition? Why is that the problem with depositors? Well, 1.32 is broader than the government restrictions. Well, explain to me. Show me what it says. Read me the actual language. The actual language is that we may close your non-U.S. dollar account, including the world markets index, CDs, et cetera, the other accounts. Okay. We deem such action necessary in our sole discretion in response to government restrictions, et cetera. So far, you can close the account. They don't dispute that. Close account and hand us our Kroners. Well, and it says, and convert the balance to U.S. dollars. So they do dispute that we're able to do that. But 1.32 is only one place that enables the bank to exercise its sole discretion, and plaintiffs ignore throughout their briefs the Florida law on sole discretion or discretion under 1.17. But what is the triggering event here? You say they can do this, but what is the triggering event in 1.32? What is the thing that gives you discretion under 1.32? And I didn't finish the language, but it's also in any other cause beyond the reasonable control. The triggering event, to answer your question, is the government restrictions from Iceland on trading in Krona, which completely halted both the forward market in order for Everbank to put a forward contract in place and comply with its safety and soundness principles, but also disrupted the wholesale spot market to the point. And in answer to your question. What you did is you basically said when this happens, we are not going to take the risk. We're going to shift the risk over to the depositors by selling them out at the lowest possible price. Why isn't it perfectly reasonable for you to have said, look, we'll go out and buy Kronas in the market, or said we will convert it back to Kronas and we'll take the risk that when the market opens it will be lower? Well, we didn't shift the risk. Everbank in 1.17 is allowed to close the account if it believes in its belief it's necessary to limit loss. Mr. Millen said to the customer and Everbank, the words in 1.17 are the customer or Everbank. So it does give us the right to close the account. But moreover, the testimony in the record is that both Everbank limited its loss, but that also loss to the customer was limited. But it strikes me what you're describing is the investment risk your bank takes. I don't understand how you can rely on some edict that came down on October 10th. This is whether the Kronas go up or down is precisely the risk that you accept when you accept these accounts. Precisely, and that's why Everbank purchases forward contracts to hedge. Well, that's for the convenience of the bank. You could have put the account into Krona directly, which you did not do. Everbank did not have an account to take the physical Krona, the testimony in the record. Could have. That's its choice how to deal with its risk. It is. It chose to deal with the risk by buying forward contracts. But that's not what the customers got. The customer said, look, I have Krona, and I would like my Krona. I do not want you to cash me out of the bond. I don't see where you can say for your convenience and to protect the bank, you can force them to take the loss. Actually, it's not for our convenience. Everbank, all the evidence in the record was that Everbank's facts were that Everbank was limiting its customers' losses as well. In other words, plaintiffs' own expert testified he knew of no trades in Krona during the class period from October 8th through the end of December 31st, 2008. And to Jejo Scanlon's point, this is not the ordinary currency fluctuation circumstance. In other words, what happened in starting the first Monday in October 2008 was the Icelandic prime minister said the U.S. is having a bailout post the Lehman Brothers and market collapse, and that's less than 5 percent of the GNP. This is in the record in the Icelandic prime minister's speech. However, the Icelandic bank liabilities were many times the island nation's GDP. And therefore, on October 6th, 2008, the prime minister put in place with the legislature in Iceland emergency regulation. They nationalized, took over the three largest banks in Iceland, put them into receivership all for the stated purpose, I think it's 648 to 50 in the record's speech, of avoiding a bankruptcy of the entire nation. The other testimony in the record, including from plaintiffs' own expert, was that Everbank very reasonably believed the currency trading in Krona might never reemerge. And in fact, because of their daily activity in the market, they could find no trades in Europe. It took three and a half weeks during the class period until they found one counterparty who would trade between Krona and Euros enough to be able to pay off the Krona that they had from their forward contract on these CDs. In other words, the government restrict, this wasn't ordinary currency fluctuation. The entire nation, as the prime minister's own words said, was fearing that it was going to go bankrupt and the banks were collapsing. Therefore, Everbank reasonably believed its customers would experience a far greater loss if it didn't get them some price for the Krona in the accounts when the CD came due. And they had the ability, under 1.17, to close the CDs prior to maturity, but gave it every day in the market until the CDs matured. What about the regulation that you're opposing, Counselor Teichberg? I said, look, you want to close them? Fine. You give us enough dollars so we can go to another window at your bank to buy the foreign currency. Why isn't that applicable? Because in the provision of the UCC, it says, unless the instrument otherwise provides. The contract is not silent on conversion rates. 2.7, and I apologize, I didn't completely finish my answer to your question. 2.7.1 provides a conversion rate for the entire duration of the CD. And, in fact, the reason in 2.7.7 that's evident is 2.7.7 is the lock-in alternative, and it says you may lock in your exit currency conversion rate prior to maturity. It makes no sense, and it is an unreasonable interpretation of the terms and conditions to ignore that the only alternative exit currency conversion rate before maturity ignores that there was a default. In other words, under TISA, yes, we have to make disclosures in this Section 2 of all the important terms of the contract, the very first provision of which is the conversion information telling them the spread is 1 percent of the spot rate. If 2.7.1 refers to converting the currency at the close, what would the appropriate currency conversion rate be? Within 1 percent of the spot price. In other words, the disclosure to customers where it says in that sentence your currency conversion rate will be within 1 percent of the wholesale spot price we pay. Well, help me sort this out. That's 252 krona per dollar. Your opposing counsel relies on the figure of 114 krona per dollar, which apparently was the going rate on that day. There's a huge disparity between the actual rate and what I guess you're talking about here in terms of a spot rate. Let me be clear, Your Honor. There is no dispute of fact that the plaintiffs all received within 1 percent of the wholesale spot rate. And plaintiffs own expert, there's no dispute in the facts, agree that the spot rate, which is the institutional rate for trading large amounts of currency in the open market, that's what plaintiffs own expert agreed. Why can the spot rate be so far off if at the original investment it was something like 70 to 80 krona per dollar, and then it declines to 252 in 3 months, yet opposing counsel tells us that one could have exchanged krona at the regular rate of 114 in the same day. Actually, plaintiffs own expert admitted that was not a rate that was available on that day for institutional large exchange of krona to dollars. One would assume, though, that the rate should be the rate more beneficial to the customer of the bank, not necessarily the bank. Your Honor, plaintiffs don't dispute that the bank paid them within 1 percent of the wholesale spot price. The rate that plaintiff is quoting, his own expert acknowledges, was not an available rate. The spot market and the retail market are separate things. And plaintiffs own expert acknowledged and explained why the difference in those rates is that a tourist can walk into a Reykjavik branch and change dollars for krona, but then acknowledge that nobody could obtain dollars for krona on those dates. Thank you very much, Your Honor. We'll give a couple of minutes for rebuttal. Your Honor, this is, Everbank's counsel, I think, has laid out that this was a crisis of Everbank's own making. What do you say about 2.71, which, incidentally, is illegible? I should tell both counsel. I don't think any human being looked at these excerpts. They're totally unreadable. They go on for pages and pages. They go from page 58 to page 130, totally unreadable. There are more on page 288, totally illegible. Why put these things in here if they're not going to be readable? Your Honor, the reason I'm the one who prepared the excerpts of record, I did it because there's only four or five critical provisions. I believe they're laid out in the briefs. Neither of us have disputed what the text is, and I think we each assumed that the Court would get it right. Then why put it in here? If we can't read it, why burden us with these things? Your Honor, this is the challenge of the Court's excerpt of record policy, which says put in as little as you can, but you have to put in everything that's important. And in a summary judgment motion, every single thing you need to figure out if the lower court judge did well or did poorly. So we just have to include it all. To me, it's a conundrum. If you're going to include it all, make it large enough to be legible. Actually, look at a human being and read it. These things here that you have white space on the page, totally unnecessary, could be enlarged. These things could be enlarged and put on separate pages. If it's important enough to put in, it should be important enough to make legible. Your Honor, I will accept. This is not my first time before this Court, but it is the first time in this situation I will accept your admonition that in the future, if there is very tiny print, it will be enlarged and noted for the Court. This will be the first and last time this office has this problem. I apologize. Okay. Send us an enlarged copy of the document that starts on ER 58. Would you like just the provisions that are mentioned in the briefs, or do you need all 58 pages? Yep, the whole thing. Counsel and I will work on that. Good. Paper and electronic. Understood. Okay. Now talk to me about 2.7.1. 2.7.1 is a four-sentence paragraph. While counsel is correct that it simply says, conversion information, the entire flow and spirit of 2.7.1 is about getting in to this account. The first sentence says, this account will be used to hold funds denominated in a currency other than U.S. dollars. So we start out with, this is to hold Krona or Euros or whatever. Second sentence, if you request, this is consensual, if you request funds in this account to be denominated in a currency other than the currency sent to us to fund this account, we'll convert your funds using a then current conversion rate set by us. In other words, you may send us, and since we're in America, probably dollars, if you send us dollars, this is a Krona account, we need to populate this account with Krona. So we're going to have to take those dollars and turn them into Krona. We're going to use a conversion rate for that. Fair enough. The parties have no problem with that. Then the third sentence, your currency conversion rate will be within 1% of the wholesale spot price we pay for your currency. Now here's the hard part about this. First of all, the sentence right before said, we will convert your funds using a then current conversion rate. The very next sentence says, your currency conversion rate will be. We're talking about the same thing. I think my example in the brief is fair. I like to eat hot dogs, period. The more mustard the better, I say. This does not mean I like lots of mustard on my lettuce or my yogurt. It's talking about when I have hot dogs, that's where I want the mustard. Now somebody who takes that one line out of context could say, well, look at Mr. Millen, the more mustard the better. I guess he likes it on his candy too. Not a fair way to parse the English language. When you have two sentences and the second sentence is highly contextualized by the first, it's very unfair to take the second in isolation. I'm sorry. You're talking in metaphors, but you're not telling me what you want to say. Okay. Your view of 2.71 in three sentences or less is. It only. No metaphors. Fair enough. What does it apply to and what does it not apply to? It only applies when a person opens a world currency account and funds it with currency that is not the denominated account. And why doesn't it apply to going out the other way? Because contextually the fairest reading is that it's contextualized to just that. Because other parts of the agreement are clear what happens at exit. And I would like to make one point clear. And which provision? 2.77, 2.78. Those talk about what happens when we're going to close your account and how we're going to. Okay. And what does 2.77 and 2.78 say? I can't read them. Why don't you tell me what they say? Your Honor, 2.77 is for nervous nevelies like myself who would like to lock in a currency conversion rate and don't want it to float. In that case, you call up the bank and you say, I'll take 120 krona. That'll do it. The bank says, okay, agreed. You've now locked in, and they call it right here, the first line of 2.77. You may lock in your exit currency conversion rate. How about 2.7? When they want to talk about exiting, they know how to talk about exiting. How about 2.7.8? Same thing. This is where you want to withdraw your money early. I already talked about it. This is where they say, we will pay you in U.S. dollars, and this is what the conversion rate will be, and we're going to pay you in U.S. dollars. This bank is very good at making clear when it's time for you to get your dollars. But the big point, Your Honor, if I can step back on this, is it's not necessary for me today to convince you that my reading is the only reading of this contract. I don't have to prove that today to Your Honors. All I have to do is have you agree. Just convincing us it's possible to read. It's susceptible. That's correct, because let's face it. If a 52-page fine print document, which is too small for judges to read, is susceptible to the interpretation we're providing, I think we know how the contra preferentum contract would probably work in these circumstances. The lower court never got there. Thank you. Thank you, Your Honor. The case is argued. The stand is removed.
judges: Kozinski, O'scannlain, Murguia